IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| PHILLIP D. MORTON, #148854, | ) | |
| Petitioner, | ) | |
| v. | ) | NO. 3:23-cv-00595 |
| BRIAN ELLER, | ) | JUDGE RICHARDSON |
| Respondent. | ) | |

# MEMORANDUM OPINION

## I. Introduction

On June 12, 2023, state inmate Phillip Morton filed a pro se Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 1.) Petitioner subsequently paid the filing fee, and on October 24, 2023, he filed an Amended Petition. (Doc. No. 12.) Petitioner challenges his February 2014 conviction and life sentence for first-degree murder in Davidson County, Tennessee. (*Id.* at 1.) Respondent filed both an answer to the Amended Petition (Doc. No. 15, "Answer") and the transcript of proceedings in state court. (Doc. No. 14.) Petitioner filed a Reply to the Answer. (Doc. No. 23.)

Upon review of these pleadings and the state-court record, the Court finds that an evidentiary hearing is not required to resolve this matter, as "the record clearly indicates that the petitioner's claims are either barred from review or without merit." *Stanford v. Parker*, 266 F.3d 442, 459 (6th Cir. 2001). As explained below, Petitioner is not entitled to habeas relief, and the Petition therefore will be denied.

## II. Procedural History

In February 2014, Petitioner was tried, convicted, and sentenced to life in prison for the first-degree murder of Keith Gaston on August 23, 2012, at the Hard Times Bar & Grill in Nashville, Tennessee. (Doc. No. 15 at 2, 4); *see State v. Morton*, No. M2017-01083-CCA-R3-CD, 2018 WL 3487220, at *1 (Tenn. Crim. App. July 19, 2018). One of the witnesses against Petitioner, Robert Earl Parker, was at the Hard Times Bar & Grill on the night in question, was in custody at the time of Petitioner's trial, and happened to be incarcerated in the same prison facility as was Petitioner roughly two weeks after Petitioner was sentenced. At that prison facility, the two allegedly had an encounter during which Parker indicated to Petitioner and other inmates that he had testified falsely during Petitioner's trial. On these grounds, Petitioner (through counsel appointed for post-trial proceedings in the trial court) sought a writ of error coram nobis in the Davidson County Criminal Court. (Doc. No. 14-1 at 72–86.) A hearing was held, (Doc. No. 14-5), and coram nobis relief was denied on January 6, 2017. (Doc. No. 14-2 at 4–23.)

Petitioner (through counsel) also filed a motion for new trial, which was heard and denied on March 29, 2017. (Doc. No. 14-2 at 40; Doc. No. 14-6.) As the hearing was nearing its conclusion, Petitioner raised an issue concerning the fact that a witness against him at his preliminary hearing, Ms. Shiema Reid, had been charged with aggravated perjury and convicted of perjury (as a lesser-included offense) based on her testimony at his preliminary hearing. (Doc. No. 14-6 at 12–19); *see State v. Reid*, No. M2015-00434-CCA-R3-CD, 2016 WL 5253207 (Tenn. Crim. App. Sept. 21, 2016).[1] The trial court rejected this attempt by Petitioner to supplement his

---

[1] Ms. Reid was indicted for testifying falsely at Petitioner's preliminary hearing, where she allegedly "did intentionally make a false statement under oath, to wit: that, on August 23, 2012, at the time that Keith Gaston was shot and killed ... she was very close to both Keith Gaston and Phillip Morton in that Phillip Morton had to move to let her pass by to get to the bar...." *Reid*, 2016 WL 5253207, at *1. She was convicted, and her conviction was affirmed, because her statement under oath was "completely false"; a

motion for new trial with the issue concerning Shiema Reid, because "[t]he grounds that he wanted to supplement would not be relevant since [Ms. Reid] never testified at [Petitioner's] trial, [and] did not appear in front of [his] grand jury." (Doc. No. 14-6 at 19.) After the motion for new trial was denied, Petitioner's post-trial attorney was allowed to withdraw, and a different attorney was appointed to file his direct appeal. (Doc. No. 14-2 at 41.)

On direct appeal, Petitioner raised two issues, asserting that: (1) the trial court erred in not granting coram nobis relief based on the evidence that Parker recanted his trial testimony in the presence of Petitioner and other inmates, and (2) the trial court erred in refusing to instruct the jury that a finding of voluntary intoxication could negate the specific intent required to commit first-degree murder. (Doc. No. 14-8.) The Tennessee Court of Criminal Appeals (TCCA) affirmed the trial court's decision against these two challenges, *State v. Morton*, 2018 WL 3487220, and the Tennessee Supreme Court denied permission to appeal. (Doc. No. 14-13.)

Petitioner timely filed a pro se petition for post-conviction relief and, after counsel was appointed and filed an amended petition, the trial court held an evidentiary hearing at which Petitioner and his lead trial attorney (Michael Engle) testified. (Doc. No. 14-15.) The post-conviction trial court denied relief. (Doc. No. 14-14 at 77–98.) Petitioner appealed to the TCCA, where he raised a challenge to defense counsel's ineffectiveness on two fronts, asserting that counsel was ineffective in failing: (1) to communicate adequately with him to develop a proper defense strategy, and (2) to cross-examine adequately one of the witnesses against him, Ms. Taffney Crowder. (Doc. No. 14-17.) The TCCA affirmed the judgment of the post-conviction trial court, *Morton v. State*, No. M2021-00171-CCA-R3-PC, 2022 WL 214669 (Tenn. Crim. App. Jan. 25, 2022), and the Tennessee Supreme Court denied permission to appeal. (Doc. No. 14-22.)

---

security video showed that she had "left the bar area several minutes before the shooting" and was in an adjacent room at the time of the shooting. *Id.* at *3.

In early 2023, Petitioner sought to reopen post-conviction proceedings in order to make numerous claims, namely that: the State had withheld from his trial attorneys the fact of Shiema Reid's perjury prosecution; the State, by charging Reid with *aggravated* perjury, demonstrated that it regarded Reid's untruthful testimony at Petitioner's preliminary hearing as material to his prosecution for first-degree murder[2]; and, therefore, the withholding of the fact of Reid's perjury prosecution[3] constituted a violation of *Brady v. Maryland*, 373 U.S 83 (1963). The trial court denied Petitioner's motion to reopen, (Doc. No. 14-25 at 22–24), and the TCCA dismissed his notice of appeal for want of jurisdiction. (Doc. No. 14-24.) The TCCA denied Petitioner's subsequent motion for reconsideration. (Doc. No. 14-26.)

Petitioner then filed this federal habeas action.

## III. Facts

The following statement of facts is taken from the TCCA's decisions on direct and post-conviction appeal. First, the evidence from Petitioner's 2014 trial, as summarized on direct appeal:

> On August 23, 2012, after learning that his ex-girlfriend was assaulted by Keith Gaston, the Defendant shot and killed Gaston, the victim, with a single gunshot to the head while they were at Hard Times Bar & Grill.
>
> As relevant to the issues raised in this appeal, Dr. Adele Lewis, chief medical examiner for Metro Nashville Davidson County, was tendered as an expert in the field of forensic pathology and testified that she performed the autopsy of the victim on August 23, 2012. She concluded that the victim's cause of death was a single gunshot to the back of his head and explained that the gun had to be in contact with the victim's head when he was shot.
>
> Detective Matthew Filter of the Metropolitan Nashville Police Department testified that he was assigned as the lead detective in the shooting, examined the scene, and found the license of Taffney Crowder on the victim's body. Detective Filter

---

[2] As noted in the TCCA's opinion in Reid's case, perjury occurs "when a person, with intent to deceive, makes a false statement under oath," while aggravated perjury "occurs when a person commits perjury, the false statement is committed in connection with an official proceeding, and the false statement is material." *Reid*, 2016 WL 5253207, at *3 & n.1 (citing Tenn. Code Ann. §§ 39-16-702(a)(1), 39-16-703(a)(1)–(3)).

[3] Reid was indicted in January 2014, and Petitioner's trial was held on February 3–4, 2014.

recovered video surveillance footage from the bar and described the timeline of the Defendant's and the victim's movements leading up to and after the shooting. Without objection, the video recordings were admitted into evidence and played for the jury.

Exhibit 6 contains thirteen clips from different camera views covering approximately thirteen minutes before the shooting and several minutes afterward. In the clips, the Defendant can be seen moving throughout the bar, walking back and forth from the pool table area, through the bar area, to the dance floor and stage, and eventually into the "cubbyhole" area behind where the victim was sitting. The Defendant's friend, Arnie Cosby, can be seen standing near the opposite end of the bar for most of the night, talking with the Defendant whenever he passed by. Shortly before the shooting, the video recording shows the Defendant waving Cosby over to the cubbyhole area. Once Cosby joins the Defendant, the two men can be seen making their way toward the victim right before the shooting occurs. Specifically, the video recording shows Cosby walking with the Defendant directly behind him until they were directly beside the victim. The victim's date, Victoria Anderson, was in between the victim and the camera during the shooting so it was not immediately evident who shot the victim. Once the shot was fired, Cosby and the Defendant immediately ran away from the victim, and the Defendant can be seen holding a beer in one hand and something under his shirt with his other hand.

On cross-examination, Detective Filter confirmed that the Defendant was "frisked or patted down" when he entered the bar. He confirmed that Shiema Reid was the bartender that night but was not near the cubbyhole area when the shooting occurred. He also confirmed that Robert Parker was working as a photographer at the bar that evening and was standing adjacent to the area of the shooting.

David Martin testified that he was working as a security guard at the bar on the night of the shooting. He confirmed that the Defendant, nicknamed "Rabbit," came to the bar frequently and that, on the night of the shooting, the Defendant appeared angry and told Martin, "I'm going to kill you[,]" while the Defendant was being frisked. He confirmed that there were no security issues with the victim or anyone else in the bar prior to the shooting. On cross-examination, Martin explained that even though the Defendant is known as a "jokester," the Defendant did not appear to be joking and that he took the Defendant's threat seriously.

Samantha Seay, owner of Hard Times Bar & Grill, testified that she was bartending on the night of the shooting with another bartender, Laquinta, and waitress, Shiema Reid. Seay provided the bar's video recordings to the police and confirmed that the Defendant was a regular patron at the bar and was present the night of the shooting.

Vertricie Willis, the mother of the victim, testified that Taffney Crowder was the victim's live-in girlfriend. Willis said she went to the bar that night with the victim, Victoria Anderson, and Michael McEwen. Willis testified that the Defendant approached her and commented on her appearance, and that she later pointed the

Defendant out to the victim to which the victim responded that he knew the Defendant. Willis confirmed that the victim did not have any altercations with anyone at the bar that night. She said she saw the Defendant in the vicinity of the victim shortly before the shooting but that she was not sure of his exact location afterward or who else could have been close enough to shoot the victim.

Victoria Anderson testified that she went to the bar with the victim and his mother and that they were frisked upon entry. She confirmed that Willis pointed out the Defendant and said the Defendant "kept staring at us, watching everything we w[ere] doing." Anderson explained that she and the victim spent some time shooting pool before they eventually made their way to the dance floor area, at which point she saw the Defendant following them. She identified herself as the woman in the video recording standing in front of the victim when he was shot but said she did not notice anything or anyone around them at that time. She confirmed that the victim did not have any altercations with anyone that night.

Taffney Crowder, the victim's live-in girlfriend, previously dated the Defendant. Three to four months before the shooting, the victim and the Defendant "had a few words" after the Defendant offered to buy Crowder a drink while she was on a date with the victim. The day before the shooting, the victim assaulted Crowder and she went to the hospital the next morning; she was placed in a boot on her leg and a sling on her arm. The victim had taken her license and money without her permission so that she would be forced to return to him after their fight. She explained that the Defendant remained friends with her father after they broke up and that the Defendant had dinner with Crowder and her father on the night of the shooting. She learned of the victim's shooting at around 4:00 the next morning and she and her father spoke to the Defendant shortly after. The Defendant told her that he left the bar approximately twenty minutes before the shooting and immediately traveled to Jackson. Although Crowder initially testified that she did not recall telling the police that the Defendant said "he was sorry that happened to [her] and that it was f[—]ked up" once he learned that the victim assaulted her or that the Defendant owned a revolver, the State introduced evidence confirming that Crowder told the police this information immediately after the shooting.

Lisa Whitaker, crime scene technician for the Metropolitan Nashville Police Department, testified that she responded to the scene, prepared a diagram of the bar, took photographs, and processed evidence. She testified that no shell casings were retrieved and opined that the weapon used in the shooting was likely a revolver because it would not eject a shell casing. On cross-examination, Whitaker agreed that she could not definitively state the weapon was a revolver.

Robert Parker testified that he was working as a photographer at Hard Times Bar & Grill on the night of the shooting and identified himself in the video recording near the back door. He said the Defendant originally entered the back door with him while helping him carry in equipment but that the Defendant went back outside and reentered through the front door with security. Approximately forty-five

> minutes before the shooting, Parker said the Defendant "asked can he have a seat, there was something he wanted to get out of his boot." Parker saw the Defendant remove his boot but did not see if the Defendant took anything out. Parker said the Defendant returned later in the evening and stated, "I'm tired of these n[———]s around here, I'm about to kill me a mother f[——]r." Parker said he tried to calm the Defendant down because the Defendant indicated someone had "put their hands on" him. Parker said the Defendant asked whether he could exit through the back door and Parker indicated that only security or the bar owner could access that door.
>
> Parker testified that the Defendant had been drinking and appeared to be "nipsy," but that he was not staggering or slurring his speech. He said he had not seen the victim in the bar before and that, although he was facing the victim when he was shot, he was looking at his computer when the victim was killed. He confirmed that he saw the Defendant in the cubbyhole area, about one to two feet from the victim, moments before the shooting. When he heard the shot, Parker said he looked up and saw the Defendant run from the area where the victim was and that the Defendant "had something in one hand and was fumbling with the other hand." He opined that there was no one other than the Defendant who was close enough to the victim to have shot him. He confirmed that the video recording accurately depicted what he remembered occurring that night. At the close of the State's proof, Defense counsel requested a jury charge of voluntary intoxication based on Parker's testimony that the Defendant had been drinking. The trial court denied the request based on insufficient evidence and stated that "it was very clear [the Defendant] wasn't" intoxicated.
>
> As part of the defense proof, Officer Bryan Toney of the Metropolitan Nashville Police Department testified that he responded to the shooting and helped to preserve the scene and interview witnesses. He specifically interviewed Robert Parker who told him that he heard the commotion from the shooting but did not see exactly what happened. In response, the State called Detective Adam Weeks of the Metropolitan Nashville Police Department who testified that he responded to the shooting and later spoke with Robert Parker at the police station. On cross-examination, he confirmed that a projectile, but no gun, was recovered from the scene.

*State v. Morton*, 2018 WL 3487220, at *1–3. Next, the TCCA summarized the evidence from proceedings on Petitioner's petition for the writ of coram nobis, as follows:

> At the October 14, 2015 error coram nobis hearing, the Defendant testified that he was being processed at West Tennessee State Penitentiary when he encountered Robert Parker on February 19, 2014, approximately two weeks after trial. During this encounter, the Defendant claimed that Parker apologized to the Defendant and Parker told the Defendant that Parker "fabricated evidence[,]" lied during his testimony, and tried "to get a mistrial." The Defendant said Parker specifically admitted to lying when he said he was previously incarcerated with the Defendant

> and that the Defendant was "nipsy" but not drunk on the night of the shooting. The Defendant stated that at least nine other inmates were present and overheard the conversation between the two men. He confirmed that he had not had any contact with those inmates or Parker since the encounter and that he did not "attempt to influence, coerce, intimidate, or [] pressure" them. On cross-examination, the Defendant denied being previously incarcerated with Parker and agreed that Parker testified to the same facts that he told Detective Adam Weeks the night of the shooting. In his petition, the Defendant included the names of nine other inmates who allegedly overheard the conversation between the Defendant and Parker and requested that they be subpoenaed to testify. The trial court continued the hearing and requested defense counsel locate these witnesses and confirm whether they were actually being processed in the West Tennessee State Penitentiary when this encounter occurred.
>
> At the next hearing on November 8, 2016, the Defendant testified consistently with his prior testimony. In addition, he confirmed that he was incarcerated with Charles Jackson, a witness to the encounter between the Defendant and Parker. Jackson testified that he was incarcerated at the West Tennessee State Penitentiary on February 19, 2014, and witnessed the encounter between the Defendant and Parker. He said he overheard Parker apologize to the Defendant and say "I did what I tried to do." He confirmed that he was housed in the same cell as the Defendant for approximately thirty days during this time. Asked what Parker said to the Defendant "word for word," Jackson stated, "I'm sorry, man, I did what I—I did what I could try to do, but I'm sorry, I didn't mean it, I'm sorry[.]"

*Id.* at *3–4.

In deciding Petitioner's appeal from the denial of post-conviction relief, the TCCA provided the following summary of the evidence from his post-conviction evidentiary hearing:

> The Petitioner testified that he had two attorneys who represented him at trial ("Counsel" and "Co-Counsel"). He remained incarcerated pending trial for approximately a year and a half. He first met Counsel in September 2013, and although the Petitioner was housed in Nashville, Counsel only met with the Petitioner "maybe four or five times." Counsel never provided all of the discovery to the Petitioner, only "bits and pieces of it." Specifically, the Petitioner never saw video footage provided in the discovery until trial. The Petitioner asked Counsel for the recordings, but Counsel never provided them.
>
> The State had obtained surveillance video of the shooting that was "grainy and blurry." The first attorney from the Public Defender's Office to represent the Petitioner, Sarah King, tried to view the recording with him on a laptop but they were unable to "make out" anything. Ms. King told the Petitioner that she would "get a[n] expert." Ms. King represented the Petitioner through his arraignment and when she accepted another job, Counsel became his attorney. The Petitioner

explained to Counsel what Ms. King had advised about the video, but Counsel never viewed the video with the Petitioner. The Petitioner first saw the video of the shooting at trial.

The Petitioner alleged that Counsel never discussed with him the possibility of an "intoxication defense" in light of the Petitioner's history of alcohol abuse. The Petitioner stated that he was intoxicated on the day of the shooting, describing himself as "dead drunk." He stated that he had purchased a bottle of Crown Royal, "had" a pint of Paul Masson, was drinking beer, smoking weed, and snorting cocaine, in the time leading up to the shooting.

About the defense strategy at trial, the Petitioner said that he was unaware of any defense strategy. He said Counsel talked with the Petitioner for "maybe two or three minutes" on the few occasions he met with him. The Petitioner wanted to testify at trial but "was maybe coerced" by Counsel and Co-Counsel who threatened "to walk off [his] case" if he chose to testify. The Petitioner explained that he had wanted to testify to tell the jury that he did not kill the victim. The Petitioner did not know who shot the victim and denied possession of a gun at the time of the shooting.

The Petitioner was unaware of any offer conveyed in his case or if Counsel ever attempted to negotiate a settlement with the State. The Petitioner alleged that Counsel and Co-Counsel also failed to interview George Crowder, Ms. Crowder's father, Michael Crowder, Ms. Crowder's uncle and Ms. Crowder's two children who would have testified that George and Michael Crowder had stated they were going to kill the victim for assaulting Ms. Crowder.

The Petitioner asked Counsel to seek a continuance for his trial because the State failed to turn over evidence that would have helped in his defense. He said without seeing all the evidence, his decision to proceed to trial was not knowing because he did not "have a grasp of the evidence."

The Petitioner testified that Counsel and Co-Counsel failed to adequately cross-examine Ms. Crowder to prove that the victim and Ms. Crowder's uncle had gotten into a fight the day before the murder. At trial, Ms. Crowder denied any sort of confrontation between the victim and her uncle. The Petitioner gave Counsel a supplemental report that indicated that Ms. Crowder had reported that the victim and her uncle had engaged in a fight. The supplemental report is part of the record and the relevant portion is, "[Ms. Crowder] said the day before Keith Gaston was murdered Keith Gaston and her uncle were outside drinking beer. She said her uncle stayed with them occasionally. Keith Gaston and her uncle got into a fight."

On cross-examination, the Petitioner agreed that Ms. King had provided him with a copy of his discovery that he reviewed; however, he never discussed the discovery with Counsel. The Petitioner maintained that Counsel never discussed the defense of voluntary intoxication with him, but he agreed that Counsel elicited testimony at trial about the Petitioner's alcohol consumption and related behavior. He also

agreed that Counsel requested a jury instruction on voluntary intoxication but the trial court declined to give the instruction.

The Petitioner maintained that Counsel and Co-Counsel argued with him about testifying so he "let them win." He agreed that he signed the paperwork indicating that he was choosing not to testify.

Counsel testified that he had practiced criminal law at the Public Defender's Office for twenty-six years. Counsel represented the Petitioner in his 2014 murder trial. Ms. King, an assistant public defender at the time, filed the motion for discovery, but Counsel reviewed the State's response once he was assigned the Petitioner's case. Counsel met with the Petitioner at court appearances, and also at the jail to discuss the case. Counsel recalled that the Petitioner asked a lot of questions as they discussed the case and the State's evidence against the Petitioner. Counsel did not recall trying to negotiate a settlement of the case, but the Public Defender's Office file reflected that Ms. King had negotiated with the State and the State offered to reduce the charge to second degree murder in exchange for a forty-year sentence to be served at a hundred percent. Counsel felt comfortable that Ms. King would have conveyed that offer to the Petitioner but described the offer as "implausible" given the Petitioner's age and the length of the sentence.

The case was originally set for October 2013, but when Ms. King left the Public Defender's office in August 2013, Counsel requested a continuance to allow him time to prepare. The trial court rescheduled the trial for February 3, 2014. According to office records, Ms. King met with the Petitioner fourteen times, and Counsel met with him seven times. Counsel denied any knowledge of exculpatory evidence that was not provided before trial.

Counsel agreed that the surveillance video footage of the shooting was blurry; however, he was not sure what an expert would have added. He explained that the Public Defender's Office had an investigator who was proficient with technology and would have advised the attorneys about the quality of the video. It was, however, recorded at night in a very crowded bar. Counsel stated that an expert would not have been able to testify about what he saw on the video as the video was the best evidence and the content would be determined by the jury.

Counsel testified that he was aware of Ms. Crowder's statement to police about her uncle and the victim engaging in a fight and that the office investigators "had looked into this fight allegation." This information was known to him at the time of cross-examination. He noted that he had not cross-examined Ms. Crowder at trial but that Co-Counsel had conducted the cross-examination.

Counsel testified that the defense strategy was to attack identification, asserting that it was not the Petitioner who shot the victim. Counsel did not recall independently his conversation with the Petitioner about the decision to testify, but he routinely spoke with all of his clients about the pros and cons of testifying. He stated that the

> Petitioner had a criminal history that included a federal firearms conviction that would not otherwise be introduced if the Petitioner did not testify. Given the facts of this case, Counsel "would generally not have favored" the Petitioner testifying.
>
> Counsel elicited testimony at trial about the Petitioner's consumption of alcohol on the night of the shooting. He requested a jury charge on voluntary intoxication, but the trial court denied his request. He explained that intoxication was not the primary defense because it conflicted with the Petitioner's strong position that he was not guilty. The Petitioner felt so strongly about his position that he even challenged Counsel's intent to suggest in closing argument that voluntary manslaughter "was the correct violation" because he believed it was conceding guilt.
>
> Counsel confirmed that both he and Co-Counsel reviewed the video of the shooting. He could not recall, however, whether he or Co-Counsel reviewed it with the Petitioner. Because the case was based on identification, he believed one or both of them viewed it with the Petitioner, but if that had not occurred, the office investigator would have done so.
>
> After Counsel testified, the State announced that because the Petitioner's allegations were against Counsel as the "lead attorney," the State did not see a need to call Co-Counsel as a witness….

*Morton v. State*, 2022 WL 214669, at *4–6.

**IV. Claims of the Amended Petition**

The Amended Petition presents the habeas claims set out below.

1. Ineffective Assistance of Trial Counsel (IATC) — trial counsel failed to:

    a. properly investigate and prepare a defense;

    b. adequately communicate plea offers;

    c. discover the Reid perjury case and use it to impeach Robert Parker;

    d. impeach Parker by showing the extent of his criminal history;

    e. object to the introduction of video evidence that was not definitive or conclusive regarding Petitioner's participation in the shooting; and

    f. obtain an expert to rebut the State's interpretation of the video evidence.

2. Ineffective Assistance of Appellate Counsel — appellate counsel failed to:

a. argue that Petitioner was denied a fundamentally fair trial based on the cumulative effect of the errors at trial;

b. argue that the limited inquiry into Robert Parker's criminal history violated Petitioner's right to confront this witness against him; and

c. assert the issue of Shiema Reed's prosecution for perjury.

3. Prosecutorial Misconduct — the State's failure to disclose to the defense the fact of Shiema Reid's prosecution for perjury violated *Brady v. Maryland*.

4. Excessive sentencing.

In the remainder of this Memorandum Opinion, the Court will refer to Petitioner's claims as they are enumerated here: Claim 1(a), Claim 2(b), and so forth.

## V. Analysis

A. Legal Standard

1. **Review of claims decided on the merits in state court**

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Upon finding a constitutional error on habeas corpus review, a federal court may grant relief only if it finds that the error "had substantial and injurious effect or influence" upon the conviction. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Peterson v. Warren*, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases … and 'to further the principles of comity, finality, and

federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). AEDPA's requirements "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) (citations omitted). The Supreme Court recently explained this "high standard" as follows:

> As we have noted many times, AEDPA sharply limits federal review of habeas claims raised by state prisoners. A federal court may grant habeas relief on a claim that a state court resolved on the merits only when the state court's "decision" was "contrary to, or involved an unreasonable application of, clearly established Federal law," or "was based on an unreasonable determination of the facts in light of the evidence presented" in state court. 28 U.S.C. § 2254(d). These standards require federal courts to give the "benefit of the doubt" to merits decisions issued by the courts of the sovereign States. *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam). AEDPA review provides an important but limited safeguard: It protects against "'extreme malfunctions'" in the state courts' adjudication of constitutional claims. *Harrington v. Richter*, 562 U.S. 86, 102, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). So in order to obtain federal habeas relief, a state prisoner must "show far more" than "'clear error.'" *Shinn v. Kayer*, 592 U.S. 111, 118, 141 S.Ct. 517, 208 L.Ed.2d 353 (2020) (per curiam) (quoting *Virginia v. LeBlanc*, 582 U.S. 91, 94, 137 S.Ct. 1726, 198 L.Ed.2d 186 (2017) (per curiam)). The habeas claimant must instead establish that the state court "blunder[ed] so badly that every fairminded jurist would disagree" with the decision. *Mays v. Hines*, 592 U.S. 385, 392, 141 S.Ct. 1145, 209 L.Ed.2d 265 (2021) (per curiam). Only then is a decision "so lacking in justification" that its error precludes even the "possibility for fairminded" dispute. *Richter*, 562 U.S. at 103, 131 S.Ct. 770.
>
> "If this rule means anything," we have said, it means that a federal court must "carefully consider all the reasons and evidence supporting the state court's decision." *Mays*, 592 U.S. at 391, 141 S.Ct. 1145. That requirement is pivotal because federal courts have "no authority to impose mandatory opinion-writing standards on state courts." *Johnson v. Williams*, 568 U.S. 289, 300, 133 S.Ct. 1088, 185 L.Ed.2d 105 (2013). And a state court "need not make detailed findings addressing all the evidence before it." *Miller-El v. Cockrell*, 537 U.S. 322, 347, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). Indeed, AEDPA requires deference even if the state court does not discuss the evidence at all. *Richter*, 562 U.S. at 99, 131 S.Ct. 770….

*Klein v. Martin*, 607 U.S. 213, 220–21 (2026).

A state court's decision is "contrary to" clearly established federal law under Section 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). An "unreasonable application" under this subsection occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413; *White v. Woodall*, 572 U.S. 415, 426 (2014). The standard here is objective unreasonableness, as determined by scrutinizing the state court decision for whether it is "so lacking in justification" that no fairminded jurist could disagree that it was erroneous. *Harrington*, 562 U.S. at 103.

Similarly, a federal habeas court may not find a state court's factual determination to be unreasonable under Section 2254(d)(2) simply because it subjectively disagrees with the determination and therefore "would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010); *see Young v. Hofbauer*, 52 F. App'x 234, 237 (6th Cir. 2002). Rather, the determination must be "objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). This is "a daunting standard." *McMullan v. Booker*, 761 F.3d 662, 672 (6th Cir. 2014) (quoting *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004)). "If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's … determination." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (quoting *Wood*, 558 U.S. at 301) (internal quotation marks omitted). Moreover, a state court's factual determinations "shall be presumed to be correct" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Davis v. Ayala*,

576 U.S. 257, 271 (2015); *Rice v. Collins*, 546 U.S. 333, 338–39 (2006). Finally, the petitioner may not prevail under Section 2254(d)(2) simply by showing that a fact was unreasonably determined; he "must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).

2. **Exhaustion of state remedies**

Review under AEDPA is not only demanding, but also ordinarily unavailable to state inmates who have not fully exhausted their remedies in the state court system. Sections 2254(b) and (c) provide that, subject to certain exceptions, a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless the prisoner previously presented the same claim to the state courts that he currently presents in federal court. *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011); *Kelly v. Lazaroff*, 846 F.3d 819, 828 (6th Cir. 2017) (quoting *Wagner v. Smith*, 581 F.3d 410, 417 (6th Cir. 2009)) (federal claim is exhausted if it was presented "under the same theory" in state court). A habeas petition is thus fully exhausted if each and every claim was first fairly presented to the state appellate court[4] as a federal constitutional claim in substance, if not explicitly. *See Gray v. Netherland*, 518 U.S. 152, 162–63 (1996); *Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (requiring the presentation of "the legal and factual substance of every claim to all levels of state court review").

a. *Exhaustion by default; habeas review unavailable*

Because the exhaustion requirement "refers only to remedies still available at the time of the federal petition," it may also be "satisfied if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law." *Gray*, 518 U.S. at 161 (citations and internal quotation

---

[4] In Tennessee, the Court of Criminal Appeals is the highest appellate court to which appeal must be taken in order to properly exhaust a claim. *See* Tenn. Sup. Ct. R. 39; *Adams v. Holland*, 330 F.3d 398, 402–03 (6th Cir. 2003).

marks omitted). The doctrine of procedural default is thus a corollary to the rule of exhaustion, one which ordinarily bars habeas review of claims that were not "fairly presented" for merits review in state court, either because they were presented in a way that failed to comport with state procedural rules or because they were not presented at all and no longer can be presented under state law. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (acknowledging "the interplay of these two doctrines" and stating that, to avoid an end-run around the exhaustion requirement and "the values that it serves," "we ask not only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies, i.e., whether he has fairly presented his claims to the state courts") (emphasis in original; internal citations and quotation marks omitted). If the state court decides a claim on "adequate and independent state grounds"— typically a procedural rule prohibiting the state court from reaching the merits of the constitutional claim— the claim will ordinarily be barred from federal habeas review because of its procedural default. *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977*); see also Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment."); *Coleman v. Thompson*, 501 U.S. 722 (1991) (same). Likewise, if a claim has never been presented to the state courts, but a state-court remedy is no longer available (*e.g.*, when an applicable statute of limitations bars a claim or state law deems the claim waived),[5]

[5] The Tennessee Post-Conviction Procedure Act provides that "[i]n no event may more than one (1) petition for post-conviction relief be filed attacking a single judgment," and establishes a one-year limitations period for filing that one petition. Tenn. Code Ann. § 40-30-102(a) and (c). The Act further provides that "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented," unless that ground could not be presented due to unconstitutional state action or is based on a new and retroactive constitutional right that was not recognized at the time of trial. *Id.* § 40-30-106(g).

then the claim is technically (though not properly) exhausted but barred by procedural default. *Coleman*, 501 U.S. at 731–32.

i. Cause-and-prejudice exception

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman*, 501 U.S. at 754).

"Cause" for these purposes "must be something *external* to the petitioner, something that cannot fairly be attributed to him[,] … some objective factor external to the defense [that] impeded … efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753 (emphasis in original). Examples of cause include the unavailability of the factual or legal basis for a claim, interference by officials that makes compliance "impracticable," or attorney error that violates the right to counsel's effective assistance. *Id.* at 753–54. To establish prejudice, a petitioner must demonstrate that the constitutional error asserted in his defaulted claim "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)); *see also Ambrose v. Booker*, 684 F.3d 638, 649 (6th Cir. 2012) (finding that "having shown cause, petitioners must show actual prejudice to excuse their default"). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial.

Attorney error that is committed during proceedings to which the Sixth Amendment right to counsel does not attach is ordinarily attributable to the habeas petitioner and thus may not serve as cause for a procedural default. *Coleman*, 501 U.S. at 754. The Supreme Court held in *Coleman* that because there is no constitutional right to counsel in state post-conviction proceedings, any attorney error at that stage that leads to the waiver of claims in state court "cannot constitute cause to excuse the default in federal habeas." *Id.* at 752, 757.

There is, however, one limited exception to this rule. In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court modified "the unqualified statement in *Coleman* that an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default," "by recognizing a narrow exception: Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id.* at 9. This exception stems from the recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim" of trial counsel's ineffectiveness, when that claim was precluded by state procedural rules from being raised on direct appeal. *Id.* at 13. In *Trevino v. Thaler*, 569 U.S. 413 (2013), the Supreme Court extended the applicability of the *Martinez* exception to states with procedural frameworks which do not technically preclude an ineffective-assistance claim on direct appeal, but which make it unlikely that the opportunity to raise that claim at that time will be a meaningful one. *Id.* at 429. The Sixth Circuit then held in *Sutton v. Carpenter*, 745 F.3d 787 (6th Cir. 2014), that under Tennessee's procedural scheme, the initial post-conviction proceeding is the first meaningful opportunity to raise a claim of ineffective assistance of trial counsel. *Id.* at 795–96.

Thus, for each defaulted claim of counsel's ineffective assistance at trial, Petitioner may overcome the default under *Martinez* if (and only if) he can show that the default resulted from his initial post-conviction counsel's ineffectiveness, and that the underlying claim of trial counsel's ineffectiveness is a "substantial one, which is to say that … the claim has some merit." *Martinez*, 566 U.S. at 13–14. The Sixth Circuit has provided the following framework to evaluate claims under *Martinez*:

> As to these claims, the district court should determine … : (1) whether state post-conviction counsel was ineffective, … and (2) whether [Petitioner's] claims of ineffective assistance of counsel were "substantial" within the meaning of *Martinez*, *Sutton*, and *Trevino*. Questions (1) and (2) determine whether there is cause. The next question is (3) whether [Petitioner] can demonstrate prejudice. Finally, the last step is: (4) if the district court concludes that [Petitioner] establishes cause and prejudice as to any of his claims, the district court should evaluate such claims on the merits…. [E]ven "[a] finding of cause and prejudice does not entitle the prisoner to habeas relief. It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted." *Martinez*, 132 S. Ct. at 1320.

*Atkins v. Holloway*, 792 F.3d 654, 660 (6th Cir. 2015) (some internal citations omitted).

Whether post-conviction counsel was constitutionally ineffective is necessarily connected to the strength of the claim he failed to raise, so "in many habeas cases seeking to overcome procedural default under *Martinez*, it will be more efficient for the reviewing court to consider in the first instance whether the alleged underlying ineffective assistance of counsel was 'substantial' enough to satisfy the 'actual prejudice' prong of *Coleman*." *Thorne v. Holloway*, No. 3:14–cv–0695, 2014 WL 4411680, at *23 (M.D. Tenn. Sept. 8, 2014), *aff'd sub nom. Thorne v. Lester*, 641 F. App'x 541 (6th Cir. 2016).

ii. Actual-innocence exception

Because the cause-and-prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a "narrow exception" to

the bar of an unexcused default in cases where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392–93 (2004) (citing *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986)); *accord Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006). To obtain habeas review under this narrow exception to the procedural-default rule, the petitioner must demonstrate his *factual* innocence, not the mere *legal* insufficiency of the State's proof; a miscarriage-of-justice claim is not supported by an assertion of mere legal innocence. *Lee v. Brunsman*, 474 F. App'x 439, 442 (6th Cir. 2012) (citing *Bousley v. United States*, 523 U.S. 614, 623 (1998), and *Calderon v. Thompson*, 523 U.S. 538, 559 (1998)).

B. Review of the Petition

1. ***Ineffective assistance of counsel***

The Sixth Amendment to the U.S. Constitution "guarantees that 'at trial and on direct … appeal every criminal defendant will have access to a lawyer to assist with his or her defense,'" and that the lawyer's assistance will be effective. *Muniz v. Smith*, 647 F.3d 619, 622 (6th Cir. 2011) (quoting *Nichols v. United States*, 563 F.3d 240, 248 (6th Cir. 2009)). Claims of ineffective assistance are properly analyzed under the two-prong standard of *Strickland v. Washington*, 466 U.S. 668 (1984), which asks: (1) whether counsel was deficient in representing the petitioner; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive the petitioner of a fair trial. *Id.* at 687. To meet the first prong, the petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness" and must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, [he] must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" *Id.* at 688–89 (quoting *Michel v. State of La.*, 350 U.S. 91, 101

(1955)). The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the … proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). It requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Petitioner asserts six claims of his counsel's ineffectiveness at trial and three claims of counsel's ineffectiveness on appeal. Respondent argues that "[P]etitioner properly exhausted in state court only an ineffective assistance claim alleging a failure to prepare for trial and develop a trial strategy." (Doc. No. 15 at 24–25.) In reply, Petitioner identifies "Trial Counsel's ineffective preparation of a defense" as a key issue in this case. (Doc. No. 23 at 1.) The Court thus begins with Petitioner's properly exhausted IATC claim.

a. *Counsel's preparation of a defense (Claim 1(a) and Claim 1(b))*

On post-conviction appeal, Petitioner argued before the TCCA that trial counsel was constitutionally ineffective in failing to "communicate adequately with the Petitioner to develop a proper defense strategy." *Morton v. State*, 2022 WL 214669, at *6; (Doc. No. 14-17 at 8). This argument on appeal, as described by the TCCA—which referenced the adequacy of communication in terms of both the development of the defense and the relaying to Petitioner of plea offers, *see id.* at *9—corresponds to Claim 1(a) and Claim 1(b) of the Petition, wherein Petitioner asserts that counsel did not properly investigate and prepare a defense or adequately communicate plea offers from the State.

Where an exhausted claim of ineffective assistance of counsel is raised in a federal habeas petition, review under AEDPA is "doubly deferential," *Knowles v. Mirzayance*, 556 U.S. 111, 123

(2009); *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 848 (6th Cir. 2017), in that "*Strickland* requires deference to counsel and AEDPA requires deference to the state court." *Moody v. Parris*, No. 20-5299, 2022 WL 3788503, at *4 (6th Cir. Aug. 30, 2022). Accordingly, the question this Court must answer is not whether Petitioner's counsel was ineffective, but "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

The TCCA, after reciting the *Strickland* standard, *see Morton v. State*, 2022 WL 214669, at *6–7, resolved the IATC claims before it as follows (starting with a lengthy quotation from the post-conviction trial court):

> In the order denying relief, the post-conviction court made the following findings:
>
>> At the evidentiary hearing [the Petitioner] acknowledged that he was initially represented by Sarah King of the Public Defender's Office after his arrest. Ms. King changed employment[,] and [Counsel] met with [the Petitioner] thereafter. [The Petitioner] testified that [Counsel] met him at the jail four or five times and conceded they spoke on court dates although he noted their discussions were minimal. [The Petitioner] stated he got "bits and pieces" of evidence during their meetings. Although [the Petitioner] stated [Counsel] did not provide him his discovery, [the Petitioner] conceded that Ms. King had provided him a copy of the State's discovery response prior to [Counsel] being assigned his case. [The Petitioner] testified that although he asked for an offer[,] one was never conveyed to him.
>>
>> [Counsel] testified that he had been employed by the Office of the Public Defender for a total of 26 years. He explained that [the Petitioner]'s case was originally assigned to Sarah King who had represented [the Petitioner] in General Sessions Court and during his first few Criminal Court appearances up until August 11, 2013. When Ms. King resigned to take a position with the post-conviction defender's office [Counsel] took over the case. [Counsel] stated that he reviewed the preliminary hearing recording and had a transcript prepared as part of trial preparations. [Counsel] enlisted Assistant Public Defender [Co-Counsel] to assist and second chair the trial.
>>
>> [Counsel] testified that the case file reflects that Ms. King had met with [the Petitioner] fourteen times. Ms. King also had filed the discovery

request with the State, and although [Counsel] believed that Ms. King reviewed the discovery with [the Petitioner], he also reviewed the State's evidence with [the Petitioner] as they prepared for trial.

> [Counsel] noted that his case file reflects that [the Petitioner] had asked Ms. King to produce legal cases for his review and she responded to the request, printing out eight or nine appellate decisions that she provided to him. [Counsel] testified that the State made its offer to Ms. King. [Counsel] stated that he feels comfortable that the offer was relayed by Ms. King to [the Petitioner]; however, he noted that the offer of 40 years at 100% was an "implausible offer" and essentially a life sentence … given [the Petitioner]'s age. [Counsel] could not recall negotiating a plea offer with the State, noting that the assistant district attorney general who represented the prosecution, [the prosecutor], was known to not settle cases and remain firm to his initial offer. [Counsel] testified that when he came on the case, a trial had already been scheduled for October 2013; however, [Counsel] filed a motion to continue in light of Ms. King's departure to allow additional time to prepare. The trial was continued to February 3, 2014. [Counsel] testified that his notes reflect that he met with [the Petitioner] seven times, with some meetings at the jail and some at the courthouse on court dates.
>
> The Court credits the testimony of [Counsel]. Nothing in the record indicates that trial counsel failed to meet with the [P]etitioner and keep him informed of the proceedings. Accordingly, the Court finds that [the Petitioner] has failed to meet his burden of showing by clear and convincing evidence that trial counsel was ineffective in his investigation or communication with [the Petitioner], and he has [not] established any prejudice resulting from the alleged deficiency.

(citations removed).

The evidence does not preponderate against the post-conviction court's finding that Counsel met with the Petitioner in preparation for trial and kept the Petitioner well informed. At the evidentiary hearing the Petitioner acknowledged that he was initially represented by Sarah King of the Public Defender's Office, and Counsel explained that the Petitioner's case was originally assigned to Ms. King, who represented the Petitioner in General Sessions Court and during his first few Criminal Court appearances up until August 2013, when Counsel took over the case. Counsel reviewed the preliminary hearing transcript as part of trial preparations and enlisted Co-Counsel to assist. Further, he requested a continuance that was granted, to allow him adequate time to prepare for trial. The Petitioner testified that Counsel met with him four or five times, noting their discussions were minimal. The Public Defender's Office files indicate that Ms. King met with the Petitioner fourteen times and Counsel met with him seven times.

> The Petitioner denied receiving discovery, saying he got "bits and pieces" of evidence during their meetings. He later conceded that Ms. King had provided him a copy of the State's discovery response prior to Counsel being assigned to his case and he had reviewed it. Counsel testified that he reviewed the discovery and the Petitioner asked a lot of questions as they discussed the case and the State's evidence against the Petitioner.
>
> The Petitioner testified that, although he asked for a plea, no offer was ever conveyed to him. The Public Defender's Office file indicated that the State conveyed an offer to Ms. King. Counsel felt confident that Ms. King would have relayed the offer to the Petitioner; however, he noted that the forty-year offer to be served at 100% was essentially a life sentence given the Petitioner's age. Counsel could not recall any further plea negotiations with the State, noting that the prosecutor assigned to the case was known to remain firm to the initial offer.
>
> The Petitioner claimed no knowledge of a defense strategy at trial and said that he never saw the video of the shooting before trial. He explained that Ms. King attempted to show him the video recording on a laptop computer, but due to the poor quality of the recording, he was essentially unable to view it. Counsel stated that he had no independent recollection of watching the video of the shooting with the Petitioner; however, both he and Co-Counsel viewed the video[,] and he believed that, if they did not view it with the Petitioner then the office investigator did.
>
> As to the Petitioner's contention that Counsel never developed a defense strategy, Counsel stated that due to the Petitioner's adamant stance that he did not shoot the victim, the defense strategy was to attack the identification of the Petitioner as the shooter. At trial, however, Counsel also elicited testimony about the Petitioner's sobriety at the time of the shooting and requested a voluntary intoxication instruction that the trial court denied.
>
> We conclude that the evidence showed that Counsel met with the Petitioner, prepared for trial, and developed a trial strategy based on discussions with the Petitioner. Accordingly, we conclude that the Petitioner has not shown that Counsel was deficient or that any alleged deficiency prejudiced him. He is not entitled to relief as to this issue.

*Morton v. State*, 2022 WL 214669, at *7–9. [6]

This analysis reasonably applies the *Strickland* standard. Petitioner's only non-conclusory argument to the contrary is that his lead defense attorney, Mr. Engle (identified as "Counsel" in

[6] The bracketed references to "the Petitioner," "Counsel," and "Co-Counsel" in this excerpt from the post-conviction trial court's opinion are original to the TCCA's opinion.

the TCCA's opinion), testified that he did not recall personally negotiating or relaying any plea offer, so Petitioner's testimony "that no offer was ever transmitted … must be accredited." (Doc. No. 1 at 16–17.) But Mr. Engle's testimony concerning the communication between Petitioner and his defense attorneys—including when Ms. King relayed the State's unacceptable plea offer and when counsel and client met to discuss discovery, the State's evidence, and Petitioner's concerns that led to a strategic focus on the issue of identification (or, alternatively, intoxication)—was found credible by the post-conviction trial court, which had the opportunity to observe the demeanor of both Petitioner and Mr. Engle during their testimony. The TCCA acted reasonably in not setting that credibility finding aside or otherwise finding that Mr. Engle performed deficiently under *Strickland* by not himself communicating the plea offer, or by relying on his co-counsel to handle some client meetings and communications. This Court therefore finds no merit in Petitioner's claim that trial counsel's preparation or communication, including the communication of the State's lone plea offer, was deficient and that Petitioner's defense was prejudiced thereby. Claim 1(a) and Claim 1(b) are without merit.

b. *Procedurally defaulted ineffective-assistance claims*

i. Claim 1(c)

In Claim 1(c), Petitioner faults trial counsel for failing to discover the Reid perjury case and use it to impeach Robert Parker. This IATC claim was fairly presented to the post-conviction trial court. (*See* Doc. No. 14-14 at 70.) That court noted Petitioner's allegation that counsel "was ineffective for failing to ensure that all exculpatory and favorable evidence in the State's possession" had been turned over to the defense, while also noting that Mr. Engle testified that Reid's perjury was irrelevant because "she was not called at trial" and that "he was not aware of any exculpatory evidence that had not been turned over by the State." (*Id.* at 86.) The post-

conviction trial court credited Mr. Engle's testimony and found that Petitioner had not carried his burden of demonstrating the existence of exculpatory evidence that the State had withheld and that counsel had failed to discover. (*Id.*)

Petitioner did not appeal the disposition of this claim to the TCCA. A claim that is denied in the trial court but not appealed to the TCCA is waived and thus procedurally defaulted. *See State v. Banks*, 271 S.W.3d 90, 121 (Tenn. 2008) ("When a defendant fails to present an issue on appeal to the Court of Criminal Appeals, that issue is … waived."). If he is to overcome the default, Petitioner must carry the burden of demonstrating cause and prejudice. *Hinkle v. Randle*, 271 F.3d 239, 245 (6th Cir. 2001) (citing *Lucas*, 179 F.3d at 418). He has not attempted to do so in either his Petition or his Reply to Respondent's Answer. Accordingly, Claim 1(c) is not subject to further review.

ii. Claim 1(d)

In Claim 1(d), Petitioner claims that trial counsel was ineffective in failing to impeach Parker by showing the extent of his criminal history. This claim was not raised during post-conviction proceedings. It may not now be raised in state court, *see* Tenn. Code Ann. § 40-30-102(a), (c); § 40-30-106(g), and is therefore procedurally defaulted. Petitioner has not attempted to show cause and prejudice excusing this default. Even if (under *Martinez*) the ineffective assistance of his attorney in the post-conviction trial court could explain the failure to raise this claim, that ineffectiveness cannot qualify as cause for the default unless the claim is "substantial"—i.e., has "some merit" justifying its adjudication despite the default. *Atkins*, 792 F.3d at 660 (quoting *Martinez*, 566 U.S. at 14). But the claim is not substantial; as Petitioner acknowledges, during a jury-out hearing on the admissibility of Mr. Parker's criminal history, "[t]he trial court limited the cross-examination of Robert Parker" on the topic to "one question … about his conviction back in

the nineties for especially aggravated robbery." (Doc. No. 12 at 19; Doc. No. 14-4 at 54.) The claim that counsel was ineffective in complying with the trial court's evidentiary ruling is not substantial. Claim 1(d) is not subject to further review.

iii. Claim 1(e) and Claim 1(f)

Petitioner next asserts that trial counsel was ineffective in failing to object to the introduction of inconclusive video evidence (Claim 1(e)) and, "[a]s a separate issue [but] related[ly]," in failing to obtain an expert to rebut the State's interpretation to the jury of the video evidence (Claim 1(f)). (Doc. No. 12 at 20.) Claim 1(e) was not raised in state court at all, while Claim 1(f) was raised before the post-conviction trial court, (Doc. No. 14-14 at 70), but not before the TCCA. Accordingly, for the same reasons discussed in connection with previous claims, these claims are defaulted. Petitioner has offered no grounds for excusing the default, and the Court does not perceive any.

Even if the ineffective assistance of post-conviction trial counsel could explain the failure to present Claim 1(e) during initial post-conviction proceedings, that IATC claim—based on failure to object to the introduction of video evidence as "vague, non-definitive and … [in]conclusive proof of [Petitioner's] alleged participation in any shooting" (Doc. No. 12 at 20)—is not substantial. The video was clearly relevant and was arguably helpful to Petitioner's defense for what it did *not* conclusively show, namely, that he possessed a handgun or that he was close enough to have put a gun to Gaston's head or fired the fatal shot.[7] In any event, given the video's obvious relevance, the State was permitted to "rely on the jury's ability to observe the [grainy] video and give that evidence the probative weight it deemed appropriate." *United States v. Lowe*,

[7] Indeed, trial counsel argued to the jury that the prosecutor "conceded in his argument … that you can't see [Petitioner] on the video at the time that the shot was fired," and that the jury could not conclude beyond a reasonable doubt that Petitioner was "the individual who fired the shot seen by no one and not displayed on the video." (Doc. No. 14-4 at 146–48.)

502 F. Supp. 3d 1332, 1335 (N.D. Ill. 2020), *aff'd*, 2 F.4th 652 (7th Cir. 2021). In the absence of apparent grounds for excluding the video from evidence, the IATC claim based on failure to object to its admission is not substantial. These claims deserve no further consideration.

iv. Claim 2(a), Claim 2(b), and Claim 2(c)

These claims of ineffective assistance of counsel on direct appeal were not properly exhausted. Petitioner included ineffective-assistance-of-appellate-counsel claims in his pro se post-conviction petition, (Doc. No. 14-14 at 42), but those claims were neither carried forward in the amended post-conviction petition filed by appointed counsel (*id.* at 68–73) nor presented on appeal to the TCCA. Even if post-conviction counsel should have raised the appellate-counsel claims presented here, the *Martinez* exception does not extend to claims of appellate counsel's ineffectiveness. *Davila v. Davis*, 582 U.S. 521, 529–38 (2017). And Petitioner makes no attempt to demonstrate cause for the default. These claims are not subject to further review.

2. **Prosecutorial Misconduct**

Claim 3 is Petitioner's primary ground for seeking habeas relief, occupying the bulk of his Amended Petition and his Reply to Respondent's Answer. The claim, as stated in the Reply, is that Shiema Reid's "lies infected [Robert] Parker's testimony," that Petitioner "was substantially convicted on this lie, and [that] the State suppressed this evidence of a lie from Petitioner at all phases of his trial and post-conviction." (Doc. No. 23 at 5.)

However, Petitioner knew of Reid's perjury at both the motion-for-new-trial stage and the post-conviction stage. Petitioner first raised it (orally) at the hearing on his motion for new trial, to no avail. (*See* Doc. No. 14-6 at 12–19.) Then, the claim based on Reid's indictment for aggravated perjury was formally pled by Petitioner in his pro se post-conviction petition, (Doc. No. 14-14 at 43–44), and by counsel in the amended post-conviction petition. (*Id.* at 70.) When

presented with the claim the second time (i.e., on post-conviction review), the trial court ruled as follows:

> [Petitioner] further testified [that] he had multiple issues with the preliminary hearing. As to Ms. Reid, [Petitioner] submits that the State failed to reveal [that] she had been indicted for perjury prior to trial. [Petitioner] acknowledged that Ms. Reid did not testify at trial, but he claimed [that] she was "a key witness used against him prior to trial because she testified at the preliminary hearing before his case was submitted to the Grand Jury.
>
> [Counsel] testified that he reviewed the preliminary hearing testimony and had a transcript prepared. Although Ms. Reid testified at the preliminary hearing and was listed on the indictment, Mr. Engle noted that she was not called at trial; thus, her prior testimony is irrelevant to [Petitioner's] jury conviction. Mr. Engle further testified that he was not aware of any exculpatory evidence that had not been turned over by the State and noted [that] no Brady violations were alleged. The Court credits the testimony of trial counsel. [Petitioner] has not demonstrated by clear and convincing evidence that the State withheld any exculpatory evidence nor has he established that his counsel was ineffective in obtaining exculpatory evidence or that he was prejudiced by the alleged deficiency.

(Doc. No. 14-14 at 86.) After this denial, Petitioner (through counsel) elected not to pursue this claim in his post-conviction appeal to the TCCA. (*See* Doc. No. 14-17.)

In early 2023, Petitioner, proceeding pro se, sought to reopen post-conviction proceedings in order to re-assert this claim. (Doc. No. 14-25 at 8–21.) The trial court denied Petitioner's motion to reopen, (*id.* at 22–24), finding that Petitioner was pressing "reiterations of claims that have already been addressed" and "attempting to take a 'second bite at the apple.'" (*Id.* at 24.) Petitioner filed a notice of appeal, but the TCCA dismissed his notice of appeal for want of jurisdiction (Doc. No. 14-24) and summarily denied his subsequent motion for reconsideration. (Doc. No. 14-26.) The TCCA explained that when the trial court has denied a motion to reopen post-conviction proceedings, the movant "must receive *permission* from this Court to appeal; he does not have the *right* to appeal." (Doc. No. 14-24 at 2 (emphasis in original).) Under state law, an application for permission to appeal must be accompanied by documentation of the proceedings below. (*See id.*

(citing Tenn. Code Ann. § 40-30-117(c); Tenn. Sup. Ct. R. 28, § 10(B); *Graham v. State*, 90 S.W.3d 687, 691 (Tenn. 2002)).) The TCCA dismissed Petitioner's notice of appeal because it did not comply with these filing requirements, inasmuch as it failed to "explain why the trial court erred in denying his motion to reopen," and to attach "any of the documents filed in the trial court, including his motion, any response thereto, and the trial court's order." (*Id.*)

"A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Walker v. Martin*, 562 U.S. 307, 315 (2011). That is the case here. Claim 3 was procedurally defaulted, first when Petitioner failed to raise the claim before the TCCA in his appeal as of right from the trial court's denial of post-conviction relief, and then when he failed to observe the filing requirements applicable to a discretionary appeal from the trial court's refusal to reopen post-conviction proceedings. Petitioner has not shown any reason to excuse the default. Accordingly, the Court cannot reach the merits of Claim 3.

Alternatively, even if the Court could reach Claim 3's merits, it would not grant habeas relief. Reid's "perjured testimony at [a] preliminary hearing could not have denied [Petitioner] a fair trial because it was not presented at trial." *Macon v. Davis*, 450 F. App'x 491, 493 (6th Cir. 2011) (citing *United States v. Angel*, 355 F.3d 462, 475 (6th Cir. 2004)). Furthermore, to the extent Petitioner asserts that the withholding or suppression of Reid's aggravated perjury charge affected his ability to cross-examine Robert Parker about his purported collusion with Reid during pretrial proceedings, and therefore violated *Brady*, habeas relief is not warranted. The Sixth Circuit has explained as follows:

> *Brady* requires that a conviction … be vacated "where the [suppressed] evidence is material either to guilt or punishment." *Strickler* [*v. Greene*], 527 U.S. [263,] 280 [(1999)] (quoting *Brady*, 373 U.S. at 87, 83 S.Ct. 1194). The scope of this materiality question is narrow, considering only whether Petitioner was prejudiced

> by the information actually suppressed. *See*, *e.g.*, *United States v. Phillip*, 948 F.2d 241, 249 (6th Cir. 1991) ("Certainly, information withheld by the prosecution is not material unless the information consists of, or would lead directly to, evidence admissible at trial for either substantive or impeachment purposes."). The inquiry does not extend to assessments of the impact that the suppression may have had on Petitioner's subsequent trial strategy. *See Joseph v. Coyle*, 469 F.3d 441, 473 n.23 (6th Cir. 2006) ("[W]e have expressly recognized the Supreme Court's explicit rejection of the argument that the materiality standard should focus on the impact of the undisclosed evidence on the defendant's ability to prepare for trial." (internal quotations, citations, and modifications omitted)); [*U.S. v.*] *Bencs*, 28 F.3d [555,] 560 [(6th Cir. 1994)] ("Materiality pertains to the issue of guilt or innocence, and not to the defendant's ability to prepare for trial.").

*Smith v. Metrish*, 436 F. App'x 554, 564 (6th Cir. 2011). Ultimately, "evidence is 'material' under *Brady*, and the failure to disclose it justifies setting aside a conviction, only where there exists a 'reasonable probability' that had the evidence been disclosed the result at trial would have been different." *Wood v. Bartholomew*, 516 U.S. 1, 5 (1995) (quoting *Kyles v. Whitley*, 514 U.S. 419, 433–34 (1995)).

Here, "the information actually suppressed" was the fact that Reid was accused of testifying falsely that "at the time that Keith Gaston was shot and killed … she was [located] very close to both Keith Gaston and [Petitioner]," when in fact (as shown by the video) she was in a different room at that moment. *Reid*, 2016 WL 5253207, at *1–3. But the nondisclosure of this information did not result in prejudice to Petitioner's defense. Indeed, there was independent testimony from Detective Filter that the video showed Parker near the "cubbyhole" area when the shooting occurred, while Reid was not near that area. In any event, the fact of Reid's indictment could not have significantly compromised the substantial evidence (besides Parker's testimony) introduced at trial concerning Gaston and Petitioner's proximity to one another at the time of the shooting. It is thus not material to Petitioner's guilt, as determined by a jury which had before it (1) video evidence of Petitioner and Cosby moving from other areas in the bar to a position in the "cubbyhole" area directly behind Gaston, and from there to a position directly beside Gaston, just

before the shooting occurred; (2) Vertricie Willis's testimony that she saw Petitioner in Gaston's vicinity shortly before the shooting; (3) Victoria Anderson's testimony that when she and Gaston moved from the poolroom area to the dance floor area, Petitioner followed them; and (4) evidence of motive, via Taffney Crowder's testimony that Petitioner learned on the day of the shooting that Gaston had assaulted and injured her the day before.

Nor is materiality demonstrated by Petitioner's speculation that Reid's testimony at his preliminary hearing "infected" Parker's trial testimony because the two, by virtue of being co-workers, must have "[been] very aware that their testimonies matched," "talked about it," and "made sure that they did not cross each other up." (Doc. No. 23 at 5.) Again, evidence is material under *Brady* only where it is reasonably probable that the evidence, had it been disclosed, would have changed the result at trial. *Wood*, 516 U.S. at 5. Where (as here) there is no such probability, it would be error to "grant[] habeas relief on the basis of little more than speculation [as to materiality] with slight support." *Id.* at 8. Accordingly, even if the Court were able to reach the merits of Claim 3, it would deny habeas relief.

3. **Excessive sentencing**

In his fourth and final claim, Petitioner asserts in conclusory fashion that his life sentence amounts to cruel and unusual punishment in violation of the Eighth Amendment, because it is "excessive and disproportionate … in the context of the facts" of his case. (Doc. No. 12 at 21.) This claim was not raised in state court. Because it cannot now be raised, *see* Tenn. Code Ann. § 40-30-102(a), (c); § 40-30-106(g), it is procedurally defaulted, and Petitioner has not attempted to show cause for the default.

Even if the default could be excused, habeas relief could not be granted. "[A] criminal sentence must be proportionate to the crime for which the defendant has been convicted," and

reviewing courts "should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals." *Solem v. Helm*, 463 U.S. 277, 290 (1983). It is clear that a life sentence is not disproportionate to the crime of first-degree murder in Tennessee, for which the punishments allowed by law (at the time of Petitioner's offense and now) are "(1) death, (2) imprisonment for life without possibility of parole, or (3) imprisonment for life[,] … [which] is defined as sixty years." *Allen v. Heidle*, No. W2025-01364-CCA-R3-HC, 2026 WL 1834369, at *5 (Tenn. Crim. App. June 25, 2026) (citing Tenn. Code Ann. §§ 39-13-202(c), 40-35-501(h)(1); *Brown v. Jordan*, 563 S.W.3d 196, 200 (Tenn. 2018)). Petitioner received the most lenient of these three allowable sentences. Accordingly, even if Claim 4 were properly exhausted, it would be without merit.

## VI. Conclusion

For the foregoing reasons, the Amended Petition for Writ of Habeas Corpus will be **DENIED** and this action will be **DISMISSED** with prejudice.

The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a Section 2254 petitioner. Rule 11, Rules Gov'g § 2254 Cases. A petitioner may not take an appeal unless a district or circuit judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336

(2003) (citations and internal quotation marks omitted). "[A] COA does not require a showing that the appeal will succeed," but courts should not issue a COA as a matter of course. *Id.* at 337.

Because reasonable jurists could not debate whether Petitioner's claims should have been resolved differently or are deserving of encouragement to proceed further, the Court will **DENY** a COA. Petitioner may seek a COA directly from the Sixth Circuit Court of Appeals. Rule 11(a), Rules Gov'g § 2254 Cases.

An appropriate corresponding order will be entered.

Eli Richardson
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE